UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOEY JOSEPH,<br>　　　Plaintiff<br><br>VS.<br><br>OFFICER P. IAPICCA, OFFICER LENTINI,<br>OFFICER RUSSELL, OFFICER VOEGELIN, AND<br>THE TOWN OF READING,<br>　　　Defendants | CIVIL ACTION<br>NO. 04-11421-JLT |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S STATEMENT
OF UNDISPUTED MATERIAL FACTS AND
DEFENDANTS' STATEMENT OF ADDITIONAL
DISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, the Defendants, in opposition to the Plaintiff's motion for summary judgment, submit the following: (1) Defendants' Opposition to Plaintiff's Statement of Undisputed Material Facts, and (2) Defendants' Statement of Additional Disputed Material Facts as to which there is a genuine issue for trial.

I. **DEFENDANTS' OPPOSITION TO PLAINTIFF'S STATEMENT
OF UNDISPUTED MATERIAL FACTS**[1]

1. Disputed in part. The transcript page of the Deposition of Joey Joseph that Plaintiff cites in support of this statement refers to a different accident that occurred in North Andover prior to February 10, 2004, which Plaintiff had witnessed.

---

[1] Each numbered paragraph responds to the corresponding numbered paragraph in Plaintiff Joseph's Statement of Undisputed Material Facts.

2. Disputed in part. The first officer to approach the train was Officer Fredericks. Thereafter, Officer Pasquale Iapicca approached the train. Deposition of Officer Pasquale Iapicca ("Iapicca Dep."), attached as Defendants' Exhibit 4 at 33.

3. Disputed. Officers asked Plaintiff for identification, which he refused to provide. Def. Ex. 4 at 31-32, 40; Deposition of Officer Bruce Russell ("Russell Dep."), attached as Defendants' Exhibit 5 at 14. Defendants did not ask Plaintiff for his social security number or address. Def. Ex. 4 at 40. Furthermore, Defendants dispute that Plaintiff ever gave his full name or that he was not asked to provide a train license or some other form of proof of identification. See Def. Ex. 4 at 38-40, Def. Ex.5 at 20-21.

4. Disputed as to the first sentence. In response to Attorney Ecker's question about whether, "in past instances, people have arrived within a few minutes from MBCR," Mr. Santa Maria responded, "yes." Deposition of John Santa Maria ("Santa Maria Dep."), attached as Defendants' Exhibit 2 at 42-43. Additionally, when asked about the normal response time, Mr. Santa Maria stated, "I couldn't even answer that." Def. Ex. 2 at 42.

5. Disputed. No written policy exists nor is there any corporate custom dictating that MBCR employees are forbidden from discussing emergency situations with the police. See Deposition of John Walsh ("Walsh Dep."), attached as Defendants' Exhibit 3 at 59-60 (Mr. Walsh stating "I would talk to the police if there's no management there, and they talk to me.") Furthermore, the MBCR expected that engineers would produce identification to local law enforcement upon request. Def. Ex. 2 at 40.

6. Disputed in part. Disputed that Plaintiff made these statements to any of the defendant officers. Def. Ex. 5 at 24.

7. Undisputed.

8. Undisputed.

9. Disputed. The deposition testimony Plaintiff cites in support of this statement refers only to Officer Frederick. Def. Ex. 4, at 33-34 (answering that Officer Frederick was "probably" frustrated); Deposition of Officer Bruce Russell, Defendants' Exhibit 5, at 27 ("I wouldn't use the word frustrated…Officer Frederick, who initiated the report, I think he was more aggravated; he was more annoyed…").

10. Undisputed.

11. Undisputed.

12. Disputed in part. Disputed that Sergeant Russell speculated as to the reasons for Plaintiff's non-compliance. Def. Ex. 4 at 40; Def. Ex. 5 at 22, 27-28.

13. Disputed in part. Officer Iapicca made this statement to Plaintiff. The decision to arrest, however, was made by the ranking officer, Sergeant Russell. Officer Iapicca only effectuated the arrest. Def. Ex. 4, at 41.

14. Undisputed.

15. Disputed in part. The topic of this conversation between Officer Iapicca and Officer Stamatis was the applicability of M.G.L. c. 90, § 25 to the Plaintiff's situation. When Officer Stamatis asked Officer Iapicca for his opinion, Officer Iapicca replied, "I didn't want [Officer Stamatis] to do anything until he spoke to Sergeant Russell, because it wasn't my arrest." Def. Ex. 4 at 57. Sergeant Russell, the superior officer at the scene, arrested Plaintiff for disorderly conduct at the outset. Def. Ex. 5 at 21.

3

16. Undisputed.

17. Disputed in part. The transcript of this recorded conversation does not state that "Russell first paused for several seconds." Affidavit of Michael Tumposky, Defendants' Exhibit 6, ¶ 4. If there was a pause, it was because Sergeant Russell was "out of breath." Def. Ex. 5 at 34.

18. Undisputed.

19. Undisputed. Additionally, Sergeant Russell states that "People were terrified on that train." Def. Ex. 6, ¶ 4.

20. Disputed in part. The officers all understood that "it wasn't Sergeant Stamatis' call." Sergeant Russell, the shift commander and ranking officer at the scene, made the decision to charge Plaintiff. Def. Ex. 4 at 63.

## II. DEFENDANTS' STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS

21. The injured pedestrian was trapped underneath the train. Def. Ex. 5 at 13.

22. The accident created a chaotic scene at the Reading commuter rail stop. Bystanders and passengers on the train became emotional. Def. Ex. 5 at 27.

23. The time after the accident was a "time of crisis." Def. Ex. 3 at 22.

24. The Reading Police Officers who responded to the scene actively attempted to manage the situation, control the crowd, and ensure the safety of the civilians present, as well as coordinate the emergency response that included a helicopter landing. Def. Ex. 4 at 23-24; Def. Ex. 5 at 13.

25. The Reading Police Officers' first priority was to identify the victim and control the crowd at the scene. Sergeant Russell responded directly to the victim and supervised the actions of the emergency personnel. Def. Ex. 5 at 12-13.

26. Officers Voegelin, Lentini, and Pasquale attempted to control the crowd so that the emergency workers could better aid the victim. Def. Ex. 4 at 23-25.

27. Officer Fredericks attempted to obtain information from the engineer. Def. Ex. 4 at 23.

28. The scene became difficult for the Officers to manage. Def. Ex 4 at 35.

29. The difficulty in managing the situation was exacerbated by the fact that the train was still running, despite the presence of emergency workers underneath. Def. Ex. 4 at 34-35; Def. Ex. 5 at 14.

30. Plaintiff was not wearing any uniform identifying him as the train's engineer, nor was he displaying any picture identification. Def. Ex. 4 at 30-31.

31. The only way a member of the public could determine whether an individual was the train's engineer would be to ask for his identification. Deposition of Gerard Demodena ("Demodena Dep."), Defendants' Exhibit 1, at 76-77. Engineers were not required to wear uniforms. Id.

32. Conductor John Walsh wore a uniform clearly identifying himself to the public as an employee of the MBCR. Therefore, the Reading Police did not need to ask for his identification. Def. Ex. 3 at 24-25; Def. Ex. 5 at 19.

33. Officer Fredricks was the first officer to approach the train. He was unable to obtain any information concerning Plaintiff's identity. Def. Ex. 4 at 24, 33.

34. Officer Iapicca was called to help with the situation after Officer Fredericks was unable to obtain any information from the plaintiff. Def. Ex. 4 at 24, 33.

35. Officer Iapicca did not know who Plaintiff was nor did he know if Plaintiff was an MBCR employee. Def. Ex. 4 at 34.

36. Officer Iapicca asked Plaintiff to identify himself several times. Plaintiff again refused to answer. Def. Ex. 4 at 31-32.

5

37. The officers called over Sergeant Russell to help. Sergeant Russell asked Plaintiff several times to identify himself. Plaintiff continued to refuse to provide any identifying information. Def. Ex. 5 at 13-14.

38. Plaintiff was given three separate opportunities to identify himself to the Reading Police by three different officers; each time he refused to cooperate with their request for identification. Def. Ex. 4 at 24, 31-34, 39; Def. Ex. 5 at 13-14.

39. Officer Iapicca asked Plaintiff to leave the train's cab and remove himself from behind the controls of a running train. Def. Ex. 4 at 39.

40. Plaintiff responded to Officer Iapicca's request that he leave the cab by yelling at the officers, "if you want me, come and get me." Def. Ex. 4 at 38; Def. Ex. 5 at 20-21.

41. Plaintiff's behavior during this incident was "weird." Def. Ex. 4 at 38.

42. The Reading Police Officers tried to cooperate with Plaintiff and prevent the situation from escalating. Def. Ex. 5 at 22.

43. Officers Iapicca and Russell were concerned that an unknown person sitting behind the controls of a running train in an emergency situation would decrease their ability to keep the accident scene secure. Def. Ex. 4 at 46; Def. Ex. 5 at 24.

44. People at the Reading commuter rail stop during the accident were terrified. Def. Ex. 5 at 36.

45. Plaintiff's behavior contributed to the fear of the passengers and people on the platform. Those present at the scene felt threatened by Plaintiff's actions. Def. Ex. 5 at 39-40.

6

46. Sergeant Russell was the ranking police officer at the accident scene. Def. Ex. 4 at 41.

47. Under these emergency circumstances, Sergeant Russell made the decision to arrest Plaintiff. Def. Ex. 5 at 14.

48. Plaintiff was arrested for disorderly conduct. Def. Ex. 4 at 59-60.

49. The MBCR has no written policy stating that train engineers are not allowed to identify themselves to local police or are required to wait for their supervisors before providing basic information such as a name. Def. Ex. 2 at 22.

50. The MBCR expects that engineers will provide basic information, such as identification, to local police. Def. Ex. 1 at 68-70.

51. After Plaintiff was arrested, he tried to prevent the officers from obtaining the identification he carried in his back pocket. Def. Ex. 4 at 53.

52. The police took Plaintiff to the Reading police station for booking after they arrested him. Def. Ex. 4 at 55-56.

53. Initially, Plaintiff refused to provide his complete name at the Reading police station. Def. Ex. 4 at 64. Eventually, the Reading Police learned Plaintiff's identity from the driver's license in his wallet. Def. Ex. 4 at 69-70.

54. Following a conversation among the Reading police and representatives of the MBCR , the Massachusetts Bay Transit Authority, and the engineers' union, the police decided to halt the booking and drop the charges against the Plaintiff. Def. Ex. 1 at 70; Def. Ex. 2 at 31-33.

55. The Plaintiff was released without being charged. Def. Ex. 4 at 78.

56. Plaintiff agreed with the MBCR representative that he should provide his identification to the police in the future. Def. Ex. 5 at 46; Def. Ex. 1 at 72, 74, 89.

Respectfully Submitted,
The Defendants,
Town of Reading, Officer Iapicca, Officer Lentini, Officer Russell, and Officer Voegelin,
By their Attorneys

/s/ Leonard H. Kesten
Leonard H. Kesten, BBO # 542042
Judy Levenson, BBO # 295570
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

DATED: October 26, 2005