# EXHIBIT 2

**Page 1**

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

                        C.A. No.:  04-11421-JLT

*****************************************
JOEY JOSEPH,                              )
         Plaintiff;                       )
                                          )
    vs.                                   )
                                          )
OFFICER P. IAPICCA, OFFICER LENTINI,      )
OFFICER RUSSELL, OFFICER VOEGELIN,        )
and THE TOWN OF READING,                  )
         Defendants.                      )
*****************************************
```

DEPOSITION OF JOHN SANTA MARIA, a witness called on behalf of the Defendant, pursuant to the provisions of Rule 30 of the Massachusetts Rules of Civil Procedure, before Meredith A. Fairbanks, a Notary Public and Shorthand Reporter in and for the Commonwealth of Massachusetts, at the offices of Brody, Hardon, Perkins & Kesten, One Exeter Plaza, Boston, Massachusetts 02116, on Friday, July 15, 2005, commencing at 9:13 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

**Page 2**

APPEARANCES:

Michael L. Tumposky
Hrones, Garrity & Hedges, LLP
Lewis Wharf - Bay 232
Boston, MA 02110
(617)227-4019
for the Plaintiff.

Deborah I. Ecker
Brody, Hardon, Perkins & Kesten
One Exeter Plaza
Boston, MA 02116
(617)880-7100
for the Defendants.

Richard A. Davey
Massachusetts Bay Commuter Railroad Company
89 South Street
Boston, MA 02111
(617)222-8022
for the MBCR.

**Page 3**

INDEX

| Deposition of: | Direct | Cross | Redirect |
|---|---|---|---|
| John Santa Maria | | | |
| By Ms. Ecker | 4 | | 46 |
| By Mr. Tumposky | | 38 | |

EXHIBITS

| No. | | Page |
|---|---|---|
| 1 | Subpoena | |

**Page 4**

* * *

John Santa Maria, a witness called for examination by counsel for the Defendant, having been duly sworn, testified as follows:

* * *

MS. ECKER: Just for the record, prior to going on the record, we have agreed to reserve all objections except as to form until time of trial. This isn't for your benefit. It's for the attorneys.

THE WITNESS: I don't even know what you're talking about.

MS. ECKER: Same as motions to strike and we've explained to the witness that he has the opportunity to read and sign and he is going to exercise that right and I will make sure that he gets a copy of the deposition transcript when it is generated.

DIRECT EXAMINATION

Q. (By Ms. Ecker) Good morning, Mr. Santa Maria. Can you just state your name for the record?

**Page 21**

    place and I didn't know if we'd have to line
    up another engineer to take over that train.
    Didn't know if we would have to, this was
    before any point of me knowing he was
    arrested, and if I'd have to send out extra
    trains.
 Q. Did the dispatcher tell you that the engineer
    had been arrested?
 A. Yes.
 Q. Did you ask why, I assume?
 A. Yes.
 Q. What did the dispatcher say?
 A. He had no idea.
 Q. When you learned that the engineer had been
    arrested, what did you do?  Did you line up
    another engineer?
 A. What are you talking about?  And then I said,
    "I'll get right back to you.  I'll line up
    another engineer."  Then I got called back a
    few moments later.  I was told the train was
    moving and I said, "How is the train moving
    if the engineer was arrested?"  And it turns
    out that there was another engineer on the
    train who was just coming in to work, so he

**Page 22**

    took over the train.
 Q. Do you know who the engineer was?
 A. I do not.  I don't remember.
 Q. If you know, are the engineers trained as to
    how to interact with local authorities if an
    emergency arises on their train?
 A. No.  During certification it is probably is
    talked about that, you know, unusual
    occurrence could take place.  But, just per
    se, you know, act professionally.
 Q. Is there any written policy of the Mass. Bay
    regarding engineer or Mass. Bay employee
    interaction with local authorities?
 A. Not that I know of.
 Q. Is there any written policy regarding the
    conduct of an investigation into an emergency
    that occurs on a train, or accident
    investigation?
 A. Is there a policy?  No, not that I know of.
 Q. Is there a procedure that Mass. Bay follows
    for investigating an incident on the train?
 A. Yes.  They're to fill out incident reports or
    accident reports.  They're to write out a
    statement of what took place and that's it.

**Page 23**

    That's what they do.
 Q. Are you involved at all in investigating
    accidents on the train if an accident occurs?
 A. Yes.
 Q. And how do you know how to conduct those
    investigations?  Were you trained in that?
 A. As I said, back during the Boston Maine days,
    again, I would ask the train crew what took
    place.  I would ask them, you know, exactly
    what took place.  Were they blowing the
    whistle at the time?  Were they coming into a
    station?  What did the person do?  Did it
    appear to be a suicide to you or was it just
    somebody jumping in front of the train or
    running to get to the other side?  And then
    I'd have them write out a statement and fill
    out our reports, which would be unusual
    occurrence reports.
 Q. Do you talk to anybody other than Mass. Bay
    employees when you conduct your investigation
    of an accident?
 A. Yes.  I would talk to the local authorities.
 Q. Whether it be M.B.T.A. or the Reading or
    other police department?

**Page 24**

 A. Correct.  Yes.
 Q. Would you talk to any civilians in conducting
    your investigation?
 A. I personally don't.  Again, the authorities,
    the local authorities or the M.B.T.A. police,
    do get, they try to get witnesses.  And with
    that, they deal with the witnesses.  I
    personally do not.  Our claims department may
    or may not get involved with them or, and
    that's, I don't do anything with the public.
 Q. Do you know if engineers, or other employees
    of Mass. Bay, are trained to identify
    themselves to local authorities in the case
    of an accident?
 A. Are they trained?  No.
 Q. Is there any directive that they're not
    supposed to identify themselves to local
    authorities in the case of an accident?
 A. No.  No.  No.
 Q. Other than the incident that we're here to
    discuss, are you aware of any other incident
    where a Mass. Bay authority, or employee, I
    should say, did not identify themselves to a
    local police department or M.B.T.A. police

**Page 29**

Q. Did he tell you why he was arrested?
A. Yes. He said that he had told the local authorities, they had asked for his name and he said his name was Joey and they asked for his full name and he said that he would give that out when his supervisor arrived.
Q. Did you talk to him at all about that? Did you ask why he didn't give his I.D.?
A. Yes, I did.
Q. What did he say to you?
A. I think he said he was in shock and he, again, he just repeated himself that I told them that I wouldn't give my name until my supervisor showed up.
Q. Did he tell you anything else about the arrest at all?
A. Not that I recall. If he did, I really don't recall.
Q. Do you remember anything else that you said to him?
A. I don't. I don't. I, I'm sorry, I deal with so many accidents and incidents and...
Q. It's okay. Just what you recall?
A. All right. Yes.

**Page 30**

Q. Approximately how long was your conversation with Mr. Joseph, do you recall?
A. It would have been short. I don't, because it wasn't really much there. It would have been short. It wouldn't have been that long.
Q. After you spoke with him, what did you do, did you go speak with the Reading police officers?
A. I spoke with the Reading police officers. We all ended up going into a room and, shortly thereafter, the gentleman in charge of locomotive engineers, Gerry Demodna, showed up.
Q. Did you talk to Mr. Demodna?
A. Yes, I did.
Q. What did you say to him, or what did he say to you?
A. The only thing I recall was, you know, he said, "What happened?"
   I said, "He got arrested for not giving his name."
Q. What did Mr., is it Demodna?
A. Yes.
Q. What did he say?

**Page 31**

A. Again, I really don't recall.
Q. And after the two of you spoke, what happened?
A. I mean, when we were speaking, we were right in the room.
Q. With Mr. Joseph?
A. No. Joseph was elsewhere. There was numerous Reading police officers.
Q. Okay. And did all of you come to some sort of agreement as to what was going to happen?
A. Yes. After, well, the Reading police and I think the Reading police and M.B.T.A. police continued to talk and that went on for a while.
Q. Why were the M.B.T.A. police there at the Reading police station?
A. They showed up for the incident, too, at some point. I don't recall when, but they were at the police station.
Q. Does the M.B.T.A. always show up to emergency situations?
A. Always? I don't, always, no. But most times, yes.
Q. How is it determined when they show up, when

**Page 32**

Mass. Bay shows up? How is it determined which authorities show up at a scene?
A. Again, that train dispatcher's manual that you get, they call the local police and the M.B.T.A. police immediately.
Q. So then the individual police departments decide whether to send someone to the scene, I assume?
A. Yes. They both would send somebody.
Q. And someone from Mass. Bay arrives; correct?
A. I'm the Mass. Bay person that arrived, yes.
Q. Does anyone call 911 at all if there's an incident with a pedestrian or, as you call them, trespassers?
A. The train dispatcher's office may, but they call the local authorities right off the bat.
Q. Who determines whether to call 911, the local authority?
A. Yes. They'd call the, they could call 911 also.
Q. The dispatcher?
A. Yes.
Q. Where in the pecking order of calls do they call 911?

**Page 33**

A. You'd have to look at that manual.
Q. Do the engineers or conductors ever call 911 who are actually on the train?
A. What they do, all they have is a radio, and they call the dispatcher.
Q. So they have no capacity to call 911 on the radio?
A. No.
Q. Are they trained as to whether to tell the dispatcher that 911 needs to be called?
A. Yes. I mean, on an incident, it happens so quickly that the phone calls are being banged out immediately.
Q. Back to the Reading police station?
A. Right. Okay.
Q. What happened? You're all sitting there talking. There's M.B.T.A., Reading police, and you and Gerry?
A. Correct.
Q. And what happened?
A. They finally released him.
Q. Do you know why?
A. I don't know why they ended up releasing him.
Q. Did you talk to the Reading police at all

**Page 34**

about why he was released?
A. If I did, it was all within that room and I, you know, my concern was...
Q. Getting the trains running?
A. Getting the trains running.
Q. Okay. Have you talked to Mr. Joseph about the incident since the Reading police station?
A. I probably spoke to him on the way out of the police station. I don't recall talking to him after that.
Q. Do you remember what you said, or he said to you, when you were walking out of the police station?
A. He was very much in shock at the time and I, I, he ended up being driven back to wherever by Gerry Demodna. So, I really didn't have very much interaction with him.
Q. Did you have him fill out an investigation report regarding, or the form, regarding the accident?
A. I would have had him make out a statement, yes. Myself or Gerry would have. I mean, Gerry, as I said, Gerry was in charge of

**Page 35**

engineers at the time and Gerry, at that point, or when they got back to North Station, I don't know when it took place, but had him write out a statement of what took place regarding the accident at Reading.
Q. Did anyone at Mass. Bay that you're aware of speak with him about his arrest after he was released?
A. The only person that probably would have would have been Gerry.
Q. But you're not sure?
A. No, I'm not.
Q. Do you know if since his arrest there's any policy or any discussion with the engineers as to when they're supposed to identify themselves to local authorities in the case of an accident?
A. No. The engineers are run by the C.F.R., which is a federal, they come under the Federal Railroad Administration, and it's a little unusual for them.
Q. Okay?
A. There isn't any, they're to give identification to railroad supervisor or an

**Page 36**

F.R.A. inspector.
Q. But does Mass. Bay train them to give their identification to any other emergency personnel on the scenes?
A. Do we train them for that? No.
Q. Do you expect them to give identification to local authorities?
A. Yes.
Q. Following your leaving the Reading police department, did you do anything else to investigate the accident?
A. No. It would have been taken over with, Gerry would have, at that point, taken it over.
Q. So once the trains are running, you're done?
A. Yes. See ya.
Q. Okay. Okay. Let me just take a look at the schedule, see what else. Is there anything, and I might have asked you this and you might just refer me to the manual, is there anything in writing from the Mass. Bay about coordination of investigation into accidents with local authorities? For instance, is there anything that says, you know, if the

**Page 37**

```
 1      local police department is involved we'll
 2      provide them with information, likewise,
 3      they'll provide us with information in our
 4      investigation?
 5   A. Is there, per se, a policy? Again, you could
 6      look at the train dispatcher's manual. But
 7      as I've seen over the years, it becomes, it
 8      just, it happens that local authorities, the
 9      M.B.T.A. police and our claims department
10      work hand in hand supplying each other with
11      pertinent information.
12   Q. Okay. All right. That's fine. Just one
13      second. Let me just make sure.
14   A. No problem.
15   Q. Did you have a meeting with, who is your
16      superior, who is your boss?
17   A. Back then --
18   Q. Do you have a boss?
19   A. Back then Michael Mally was my supervisor.
20   Q. Did you speak with Mr. Mally about the
21      incident?
22   A. I had just explained that he got arrested and
23      Gerry Demodna had Joey Joseph and was
24      bringing him back to Boston and he would have
```

**Page 38**

```
 1      dealt with Gerry at that point.
 2   Q. Did you tell him anything about his failure
 3      to identify himself to the local authorities?
 4   A. I don't recall. I really don't. I probably
 5      did.
 6   Q. Do you recall what he said to you, if
 7      anything?
 8   A. No.
 9   Q. Do you know if Mr. Joseph was disciplined or
10      retrained by Mass. Bay after the arrest?
11   A. No, he was not disciplined.
12   Q. Do you know if he was retrained at all?
13   A. Again, if he was, it would have been with
14      Gerry.
15         MS. ECKER: All right. I don't have any
16      other questions for you. This attorney
17      might.
18         THE WITNESS: Hi.
19         MR. TUMPOSKY: Hi. How you doing? Just
20      a few.
21      CROSS-EXAMINATION
22   Q. (By Mr. Tumposky) Now, you had said that
23      Mass. Bay policy, as far as engineers are
24      concerned, at an incident like this is to
```

**Page 39**

```
 1      call an emergency three times; is that right?
 2   A. Right.
 3   Q. But it's the train master's responsibility,
 4      which I guess would be you in this case, to
 5      deal with the authorities, right?
 6   A. Correct.
 7   Q. So the engineer isn't expected to handle
 8      interactions with the local police
 9      departments in a situation like this?
10   A. No. The local police departments or the
11      M.B.T.A. police usually ask questions of what
12      took place.
13   Q. But as the train master, it's your primary
14      responsibility once you arrive on the scene
15      to be the liaison between the M.B.C.R. and
16      the local police departments; is that right?
17   A. On a normal occurrence. But this happened so
18      quickly, and everybody was gone by the time I
19      got there.
20   Q. Fair enough. But on a normal occurrence,
21      that would be the understanding --
22   A. Yes.
23   Q. -- of employees of M.B.C.R., that the train
24      master is the one who is going to be the
```

**Page 40**

```
 1      liaison between the company and the local
 2      police department?
 3   A. That's basically true, yes.
 4   Q. Now, you mentioned that the engineers are
 5      expected to produce identification to local
 6      law enforcement, right?
 7   A. Yes.
 8   Q. But they're never trained in that regard?
 9   A. No.
10   Q. So it's quite possible that the engineers
11      would not necessarily be aware of this
12      expectation?
13   A. Again, they come under the federal law,
14      engineers do, and the federal law is that
15      they give identification, their engineer
16      certificate, to either federal or railroad
17      officials.
18   Q. Okay?
19   A. That's the federal law.
20   Q. Now, when you heard that Mr. Joseph had been
21      arrested, were you surprised? You sound
22      surprised.
23   A. Yes, I was very surprised.
24   Q. Had you ever heard, in all your 25-some-odd
```

**Page 41**

1  years, of an engineer being arrested at the
2  scene of a train accident?
3  A. No.
4  Q. So this was a totally unusual occurrence?
5  A. Yes.
6  Q. Following a train accident. And when you
7  went to the police station to investigate why
8  Mr. Joseph had been arrested, did you ever at
9  any time learn the grounds for his arrest?
10 A. All I was told was that he refused to give
11 his name, and I don't know what took place at
12 the scene because I wasn't there.
13 Q. You were told that by Mr. Joseph or by the
14 officers?
15 A. I don't recall.
16 Q. So you don't recall the officers ever
17 explaining exactly why he had been arrested?
18 A. No. Most of the, most of their dealings, I
19 think, were with the M.B.T.A. police.
20 Q. Okay?
21 A. The Reading Police.
22 Q. Now, just backing up a little, I guess?
23 A. Yes.
24 Q. You said that sometimes it can take as little

**Page 42**

1  as five minutes for you to get to an accident
2  site?
3  A. Correct.
4  Q. What would you say is the normal time either
5  you or another responder from the M.B.C.R.,
6  how long would it normally take them for
7  someone to first arrive at an accident site?
8  A. I couldn't even answer that.
9  Q. But five minutes, it would be often five
10 minutes, would you say?
11 A. Well, I was the field train master at the
12 time, and I could be anywhere between
13 Fitchburg, Rockport, Haverhill, Lowell,
14 Boston.
15 Q. Are there other people who --
16 A. Newburyport.
17 Q. -- who would arrive on the scene before you
18 in circumstances like that from M.B.C.R.?
19 A. Yes. There are a few other train masters,
20 and depending on who would be closer to
21 respond.
22 Q. But in this instance you were the closest?
23 A. Yes.
24 Q. Would you say that, in past instances, people

**Page 43**

1  have arrived within a few minutes from
2  M.B.C.R.?
3  A. Yes.
4  Q. Now, going forward a little bit, when you
5  arranged for, or how was it arranged that
6  Mr. Joseph was released, the police
7  department just agreed to release him?
8  A. I'm going to say yes to that. It had nothing
9  to do with me.
10 Q. But you didn't post bail or anything like
11 that?
12 A. No.
13 Q. He was just let out the door?
14 A. I don't even know if he was arrested, to be
15 honest with you.
16 Q. And you didn't hear about any formal charges
17 being brought or anything like that?
18 A. No.
19 Q. And then when you were investigating this
20 incident, you mentioned that you spoke to
21 Mr. Joseph about it; is that right?
22 A. Briefly, at the police station.
23 Q. But you also mentioned later on the next day
24 that you asked him to give a formal, not you,

**Page 44**

1  but the M.B.C.R.?
2  A. No, Gerry Demodna would have had him write
3  out a statement of what took place.
4  Q. What was his position?
5  A. He was general row foreman at the time.
6  Q. And is this a common procedure for
7  investigating internal incidents at M.B.C.R.?
8  A. Yes. It turns out that Gerry Demodna, who
9  was in charge of locomotive engineers, came
10 to the scene and he took it over.
11 Q. But as far as giving statements, that's a
12 normal part of the internal investigative
13 procedures of M.B.C.R.?
14 A. Yes. Yes.
15 Q. And that's a private organization, right?
16 A. Yes.
17 Q. So there was no law enforcement involved in
18 this investigation, the internal
19 investigation, there's no law enforcement arm
20 of your agency, right? Like the T has their
21 own police department. You guys are just?
22 A. No, the T police will quite often respond to
23 our incidents, unusual occurrence.
24 Q. But they weren't involved in the internal