# EXHIBIT 3

### Page 1

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

                    C.A. NO.:   11421-JLT
********************************************
JOEY JOSEPH,
          Plaintiff,                )
                                    )
     vs.                            )
                                    )
OFFICER P. IAPICCA, OFFICER LENTINI,)
OFFICER RUSSELL, OFFICER VOEGELIN,  )
and THE TOWN OF READING,            )
          Defendants.               )
********************************************
```

DEPOSITION OF JOHN H. WALSH, a witness called on behalf of the Defendant, pursuant to the provisions of Rule 30 of the Massachusetts Rules of Civil Procedure, before Meredith A. Fairbanks, a Notary Public and Shorthand Reporter in and for the Commonwealth of Massachusetts, at the offices of Brody, Hardoon, Perkins & Kesten, One Exeter Plaza, Boston, Massachusetts 02116, on Friday, July 15, 2005, commencing at 10:02 a.m.

```
        DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
                    One State Street
                Boston, Massachusetts 02109
                 Telephone (617) 742-6900
```

### Page 2

APPEARANCES:

Michael L. Tumposky
Hrones, Garrity & Hedges, LLP
Lewis Wharf - Bay 232
Boston, MA 02110
(617)227-4019
for the Plaintiff.

Deborah I. Ecker
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA 02116
(617)880-7100
for the Defendants.

Richard A. Davey
Massachusetts Bay Commuter Railroad Company
89 South Street
Boston, MA 02111
(617)222-8022
for the MBCR.

### Page 3

**INDEX**

| Deposition of: | Direct | Cross | Redirect |
|---|---|---|---|
| John H. Walsh | | | |
| By Ms. Ecker | 4 | | 59 |
| By Mr. Tumposky | | 46 | |

**EXHIBITS**

| No. | | Page |
|---|---|---|
| 1 | Diagram | 46 |

### Page 4

            * * *

John H. Walsh, a witness called for examination by counsel for the Defendant, having been duly sworn, testified as follows:

            * * *

DIRECT EXAMINATION

Q. (By Mr. Ecker)  Good morning, Mr. Walsh?
A. Hi.
Q. Can you please state your name for the record?
A. John, middle initial H, Walsh.
    MS. ECKER:  Just for the record, again, the attorneys have agreed to reserve all objections except as to form until time of trial, same as motions to strike, and the witness will have the opportunity to read and sign the deposition transcript.  I will make sure that your counsel gets a copy and he will forward it to you.
    MR. TUMPOSKY:  Yes, we've agreed.
Q. (By Ms. Ecker)  I know you've spoken with your counsel, so I will, and not to bore these gentlemen, I will keep my introductory

**Page 21**

We're within three feet, two feet, of a perfect stop. Because right here, most conductors, this would be the rear double because we're going in this direction.
Q. Correct?
A. You want the rear double on this handicap platform. You normally don't use the rear single because you're subjecting who is ever in a wheelchair or a walker or whatever, they're closer to the fumes of the diesel.
Q. Can you just put an "H" in that handicapped spot for me so when I get the transcript I can figure out what you're talking about?
A. If you don't want this, that's fine. I'm just trying to make it easy.
Q. No, I really do. I'd like you to sign it actually. If you just want to sign and date it as your artwork, we can preserve it?
   MR. DAVEY: Do you want to wait until he finishes?
Q. (By Ms. Ecker) Yes, wait until you finish. Maybe you're going to mark it up a little bit more.
A. Okay.

**Page 22**

Q. So did you go back to the back of the train to make sure that you had cleared Woburn Street?
A. No need to. I can see it. The gates are up, you're clear.
Q. Did you talk to any of the passengers on the train?
A. I turned around and I said, "Has anybody called the Reading police?"
Q. To the passengers you said that?
A. Yes. They're standing there. I mean, this is a time of crisis. They cooperate. Three of them had cell phones in their hand. They're all trying to get through.
Q. So they had already called?
A. Yes. I still called and they said, "Yes, we know about it."
Q. You called Reading police?
A. Yes.
Q. How did you call, on your two-way or on your cell?
A. My cell phone.
Q. And they said they already knew about it?
A. Yes.

**Page 23**

Q. How long did it take the Reading police department to get to the station, approximately? Under five minutes?
A. Definitely.
Q. Did any other law enforcement officials arrive at the accident scene prior to Reading?
A. No.
Q. When the Reading police arrived, did you speak with them?
A. No.
Q. Did you ever speak with the Reading police at the scene?
A. I can't answer that.
Q. You don't remember?
A. I came around here to the corner of the depot.
Q. Yes?
A. Okay? And when the police arrived, one, I think one cruiser was up here and one cruiser was back here, and I went back and I think I told the officer driving this vehicle that we struck someone and she was on the ground and a fire department showed up and I told them

**Page 24**

where I wanted them to bring the stretcher.
Q. Okay?
A. I mean, did I talk to them? I might have said, Yes, she's over here, and then I probably walked right away and got the fire fighters because they're the rescue personnel. I can't answer that question other than that. I don't remember.
Q. Were you in uniform?
A. Positively.
Q. Oh, okay. Conductors wear uniforms then?
A. Yes.
Q. Do you have a name tag?
A. Yes, I do.
Q. You wear it on your uniform?
A. Yes, I do.
Q. First and last name?
A. No.
Q. Just first?
A. Yes.
Q. Did any law enforcement official, whether it be Reading, M.B.T.A., or any other official who happened to arrive, ask you for identification at the accident scene?

**Page 25**

```
     Q.  Did any --
     A.  Not to the best of my knowledge.
     Q.  Did any of the local officials, Reading,
         M.B.T.A, ask you for an incident statement,
         what happened, that you recall?
     A.  Yes.
     Q.  Do you know who it was, was it M.B.T.A or
         Reading?
10   A.  I don't think we gave statements until we got
11       back to North Station, and it was the M.B.T.A
12       police, to the best of my knowledge.
13   Q.  When you were trained by, I guess initially,
14       Amtrak, were you trained as to -- let me
15       start my question again.  When you were
16       trained by Amtrak, did they discuss with you
17       coordinating investigations at an accident
18       scene with local authorities?
19   A.  I'm not sure.
20   Q.  Were you retrained when Mass. Bay took over
21       their commuter rail system?
22   A.  No.
23   Q.  Did they give you, did Mass. Bay give you
24       their own policy and procedure manual when
```

**Page 26**

```
1        they took over the system?
2    A.  Yes.
3    Q.  And you still have that manual?
4    A.  Yes, I do.
5    Q.  And you were supposed to have read it at some
6        point in time?
7    A.  Yes.
8    Q.  Did they make you sign for it?
9    A.  Yes.
10   Q.  Is there anything in there that you're aware
11       of as to what you were supposed to do, or
12       what information you're supposed to give to
13       local authorities, at an accident scene?  If
14       you don't know, you don't know.  You can just
15       tell me.  He's going to give me the manual.
16   A.  Usually -- am I supposed to say "yes" or
17       "no?"
18           MR. DAVEY:  If you don't remember, then
19       say that.  If you want to explain it, then
20       say that.  Don't guess.
21   A.  I'm not guessing.  I know what happened.  All
22       right.  Let me answer it this way.  Normally,
23       when there's an incident.
24   Q.  (By Ms. Ecker)  Yes?
```

**Page 27**

```
1    A.  Some, a management person shows up.  I've
2        known Mr. Santa Maria for a long, long time.
3    Q.  Back to Boston and Maine Railroad?
4    A.  As a matter of fact.
5    Q.  Yes?
6    A.  And I know that he lives in the next town, a
7        surrounding town, but the next town.  We
8        struck the woman.  I'm looking at her.  She's
9        screaming in pain.  Supposedly a doctor, as
10       I'm informed, three women tending to her.  I
11       tried the Reading police.  I couldn't, the
12       phone was busy.  I called the dispatcher and
13       told them that we struck someone, I think my
14       engineer is in shock, or whatever words I
15       used, and I asked for specifically call John
16       Santa Maria because I know he lives in a
17       neighboring town.  They border.
18   Q.  Did you know he was home at the time?
19   A.  No, I did not.  I was hoping.  Because I knew
20       that in less than five minutes he'd be here.
21       Now, normally, when something happens, they
22       send a management person.  The reason I asked
23       for John was he lives in the next town.  And
24       they handle press, police.  I do the
```

**Page 28**

```
1        immediate stuff like get the fire department
2        to where she is or...
3    Q.  Have you --
4    A.  I'm not trying to dance here.  I'm trying to
5        answer your question.
6    Q.  Have you ever been involved, in all your
7        years in the railroad, in an accident while
8        you're the conductor where a police officer
9        has asked you information about the accident
10       at the scene?
11   A.  Yes.
12   Q.  And have you responded to the police officer?
13   A.  Positively.
14   Q.  And in this case, if Reading police officer
15       had asked you to identify yourself to him,
16       would you have identified yourself?
17   A.  Positively.
18   Q.  So after you direct the fire department to
19       where the woman was, do you remember what you
20       did at all?
21   A.  Yes, I do.
22   Q.  Okay.  What did you do?
23   A.  Went up to the window.
24   Q.  The window of what?
```

**Page 57**

...they
...and battery?
...in the way. You're
...was in my mind and what my
...opinion was at the time and that's
...was.

...when they went --
I can...

Q. Your opinion is welcome here. That's fine.
A. Okay. I mean, you're dealing in facts and I'm dealing in, I don't know how far I can go with this, you know what I mean? I've been through depositions before, but it's never been quite this intense.
Q. Okay. So now they made the decision to arrest him, and they went through the train, right?
A. Yes.
Q. Went into the cab and grabbed him?
A. Yes.
Q. And dragged him back through one of the cars?
A. I saw them cuff him through the door and then they dragged him back through the first car and down this car and down the stairs of the

**Page 58**

rear of the first car.
Q. Okay. And then out the door of the train and then where?
A. They put him in a cruiser which, at this point, was on this side of the depot and I was over here. So, it was out of my sight.
Q. Okay?
A. When he crossed over and went behind the corner of the depot, I have no clue.
Q. Now, were they being rough with him at this time? I mean, how would you characterize their actions during the time they dragged him from the cab through the train and then to the police car?
A. Didn't see them actually drag him through the train. Because when you're standing there, the vestibule, the trap that he's standing on, a trap is a thing that swings up so you can come down the stairs.
Q. Right?
A. There are stairs in the cab on that end of the train, but he's about, the trap is probably this high off the ground. Now, here's the bottom of his feet. He's

**Page 59**

five-eight, five-ten, I don't know. I'm looking up and I see them through the windows because I never left the platform. I see three people coming down the aisle, but I can't see hands.
Q. Sure?
A. I can't see if they're grabbing him. I can't see if he's willfully walking. I don't know. Then when they came down off the rear of the car, one police officer came down, he came down cuffed, and another police officer came down and they kind of walked two steps, one got on one side and one got on the other side. They grabbed him around the arm and they walked around this corner of the depot and I don't know, I never saw him again.

MR. TUMPOSKY: I think that's it.
MS. ECKER: I have a few questions.

RE-DIRECT EXAMINATION

Q. (By Ms. Ecker) You just testified that it's the Mass. Bay or the railroad's policy that you don't talk to the police. Is that a written policy?
A. I might have misspoke. We definitely don't

**Page 60**

talk to the press, and, if I can explain it, if management was there, I would let them do the talking to the police. I would talk to the police if there's no management there, and they talk to me.
Q. Right. And there was no management there at this scene; correct?
A. No.
Q. And one other thing. What do you base your opinion on that they wanted to arrest Mr. Joseph because he was black? Did you hear them say any racial comments?
A. They made no racial comments, no.
Q. That's just your opinion?
A. My opinion was -- yes.

MS. ECKER: I have nothing else.
(Whereupon the deposition of John H. Walsh concluded at 10:58 a.m.)